IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

COX V. ROWE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ELIZABETH COX AND JOSEPH COX, APPELLEES,

V.

WEI W. ROWE AND TREVOR R. ROWE, APPELLANTS.

Filed August 11, 2020.    No. A-19-1010.

Appeal from the District Court for Dougals County: THOMAS A. OTEPKA, Judge. Affirmed.

Zachary W. Lutz-Priefert and Frederick D. Stehlik, of Gross & Welch, P.C., L.L.O., for appellants.

Steven D. Davidson, of Baird Holm, L.L.P., for appellees.

MOORE, Chief Judge, and BISHOP and WELCH, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Wei W. Rowe and Trevor R. Rowe (the Rowes) appeal from an order of the district court for Douglas County which quieted title to certain disputed real property owned by the Rowes in Elizabeth Cox and Joseph Cox (the Coxes) under the theory of adverse possession. For the reasons set forth below, we affirm.

### BACKGROUND

The parties own certain adjacent property in Omaha, Nebraska. The Rowes own a wedge shaped parcel, and the rear portion of that parcel is traversed by a drainage creek on a diagonal line from northwest to southeast. According to testimony from Elizabeth at trial, the creek is "just a little bit of a stream" under normal weather conditions, but when there is a strong rain, it "rises high" and is "dangerous." The rear boundary of the Rowe parcel on the northern side of the creek

- 1 -

(the opposite side of the creek from where their residence is located) also runs diagonally and abuts the entire rear boundaries of two other properties, as well as a portion of the rear boundary of the Cox property. Specifically, the Rowe and Cox properties abut on the northwest end of the Rowe rear boundary and the southeast end of the Cox rear boundary. The Coxes' backyard contains two mulched and landscaped berms, and the diagonal boundary line separating the Rowe and Cox properties runs lengthwise through the middle of one of these berms. At some point, the Rowes had a survey done in contemplation of placing a fence along the rear boundary of their property, and in March 2018, they sent letters to the Coxes informing them that their mulch and landscaping extended beyond the Cox boundary and asking them to remove it from the Rowe property.

On June 21, 2018, the Coxes filed a complaint in the district court, seeking to quiet title to a portion of the Rowe parcel, which they claimed by adverse possession by themselves and their predecessors in interest as a part of their residential backyard. The disputed property is an approximately 9-foot-by-34-foot rectangular section of the northwestern corner of the Rowe parcel. It includes a portion of one of the berms, as indicated above, and is defined by the corner of the Rowe rear property line, along the edge closest to the creek by a brick and stone inlaid border which the Coxes installed along the edge of the creek in 2005, and by the edged grass line around the southeastern corner of the sod in the Coxes' backyard. A surveyed description of the disputed property was entered into evidence at trial.

Shortly after the Coxes filed their complaint, the district court entered a stipulated temporary injunction, enjoining the Rowes from making or causing any change to or improvement upon the disputed property as defined in the complaint, including by placement of any fence, pending the final disposition of the case.

A bench trial was held before the district court on July 10, 2019. Elizabeth testified for the Coxes, and both of the Rowes testified in support of their opposition to the adverse possession claim. The court received various photographs and other documentary evidence offered by the parties, and it denied the Rowes' motions to dismiss made at the close of the Coxes' case and again at the close of all evidence.

Elizabeth's parents originally purchased the Cox property as joint tenants in April 1970, when Elizabeth was 2 years old. Elizabeth resided there with her parents until she left for college in 1986. Elizabeth's father died in 1987, and her mother continued to reside on the Cox property after his death. Elizabeth purchased the property from her mother in November 1998. Elizabeth married Joseph in 2003, and they have resided together on the Cox property since that time. Elizabeth transferred title of the Cox property by quitclaim deed to herself and Joseph as joint tenants in January 2009. The Rowes purchased the Rowe property in 2013, and they have resided there since that time.

There was not a survey completed of the Cox property in 1998 when Elizabeth purchased it from her mother. Elizabeth testified that at that time, she was unaware that the rear boundary of the Rowe property extended into what she considered her family's backyard. Likewise, no survey was completed at the time Elizabeth transferred her interest in the Cox property to herself and Joseph as joint tenants. Elizabeth indicated that her family "believed and continued to believe" from 1970 on that the creek was the boundary line between the properties. According to Elizabeth,

she first became aware of the actual boundary location in 2018 when the Coxes received letters from the Rowes with respect to that issue.

There was evidence at trial about the use and improvement of the disputed property as part of a residential backyard, first by Elizabeth's parents when she and her siblings were growing up, and then by the Coxes and their children. During the time when Elizabeth's parents owned the Cox property, the disputed parcel was used for a tilled garden. Elizabeth and her siblings pulled weeds from the garden and harvested fruit and other produce from it. The entire backyard, including the disputed property, was also used regularly for recreational activities, including children's games in which the back corner of the yard and access to the creek were key features. The district court received photographs into evidence documenting the use of the disputed property during this period.

When Elizabeth purchased the Cox property from her mother, she continued to use the disputed property for gardening and horticultural activities that required some maintenance by her. After Elizabeth's marriage to Joseph, the Coxes began to make further improvement to the Cox property. In 2004, an underground sprinkler system and an underground dog fence were installed, each of which extend through the disputed property, although Elizabeth was unsure at trial whether any sprinkler heads were located on the disputed property. In 2005, prior to a christening party for their first child, the Coxes had professional landscapers create a grass covered bean-shaped berm, approximately 10 to 12 feet in length, in both rear corners of their backyard, one of which extends into the disputed parcel. The berms were created using 8 cubic yards of top soil, 3 cubic yards of clay soil, and 3 cubic yards of compost to raise the berms approximately 1½ feet above ground level. They were then covered with 50 rolls of sod. Photographs taken during 2005 and the following years confirm that change to the topography of the Coxes' backyard.

Also in 2005, the Coxes installed an inlaid brick and stone border along the edge of the creek extending across the entire length of what they considered their backyard, including the disputed property. The Coxes used stones taken from an inside fireplace that were removed during simultaneous interior remodeling, bricks from some prior home improvement projects, and rocks taken from the creek. The installation of this inlaid border was largely completed in 2005, and it has remained in place since that time. According to Elizabeth, the footprint of the inlaid border has been the same since its installation in 2005.

There was evidence about landscaping done by the Coxes on and around the two berms in 2005 and succeeding years. Since the creation of the berms, the Coxes have added mulch and plants, including rhubarb, hostas, and day lilies, to the berms; the mulch and plants appear in various photographs in the record of the berm in the disputed area. Additional professional landscaping of the berms occurred in 2013, when the Coxes implemented a more comprehensive landscaping plan for their property. According to Elizabeth, the Coxes were regularly and physically present on the disputed property, working to improve and maintain its appearance.

There was evidence about Elizabeth's recreational use of the disputed property after her purchase of the Cox property, and the Coxes' continued recreational use of the disputed property after their marriage, including use by their children and family pets. Their recreational use of the their backyard, including the disputed property, encompassed such activities as neighborhood Easter egg hunts where Easter eggs were hidden inside plants on the berms; Fourth of July parties

where tents and chairs were placed upon the disputed property; and regular birthday, graduation, and other family celebrations with activities that extended into the disputed property. The record shows that the Coxes' children have regularly used their backyard, including the disputed property, for games such as baseball, football, and tag. The Coxes' recreational use of the disputed property has also included winter activities such as building snow forts and having snowball fights. Finally, the Coxes' dogs regularly run in the backyard, including on the disputed property.

Prior to receiving the letters from the Rowes in March 2018 demanding that the Coxes relocate their landscaped berm and claiming that it extended across the Rowe property line, the Coxes were not aware of the location of the actual boundary line. At some point in March 2018, the Coxes' backyard was marked by a surveyor and fencing contractor retained by the Rowes to install the above-described fence along the Rowe rear property line.

We have set forth additional evidence, including relevant portions of the Rowes' testimony, as necessary in the analysis section below.

On August 1, 2019, the district court entered judgment in favor of the Coxes, finding that they had established each element of their claim for adverse possession, and we discuss the court's analysis of the issues in greater detail below. The court also enjoined future adverse use of the disputed property by the Rowes, including installation of the proposed fence. Subsequently, the court denied a motion for new trial filed by the Rowes, and the Rowes perfected their appeal to this court.

ASSIGNMENTS OF ERROR

The Rowes assert, reordered and restated, that the district court erred in (1) finding that the Coxes' possession of the disputed property was continuous, exclusive, and notorious for the statutory period of 10 years; (2) overruling the Rowes' motion to dismiss at the close of evidence; and (3) denying their motion for new trial.

STANDARD OF REVIEW

A quiet title action sounds in equity. *Adair Holdings v. Johnson*, 304 Neb. 720, 936 N.W.2d 517 (2020). On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

A motion to dismiss at the close of all the evidence has the same legal effect as a motion for directed verdict. *American Central City v. Joint Antelope Valley Auth.*, 281 Neb. 742, 807 N.W.2d 170 (2011). In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Anderson v. Babbe*, 304 Neb. 186, 933 N.W.2d 813 (2019).

- 4 -

An appellate court reviews a denial of a motion for new trial for an abuse of discretion. *Id*. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020).

ANALYSIS

A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for a statutory period of 10 years. *Siedlik v. Nissen*, 303 Neb. 784, 931 N.W.2d 439 (2019). See, also, Neb. Rev. Stat. § 25-202 (Reissue 2016). Upon our de novo review of the record, we conclude that the district court correctly found that the Coxes' possession of the disputed property was actual, continuous, exclusive, notorious, and under a claim of ownership for a period of at least 10 years. The Rowes argue that the Coxes' possession was not continuous, not exclusive, and not notorious. Accordingly, we address those three factors.

*Continuous Possession.*

Title cannot be acquired by adverse possession without the simultaneous and continuous existence of each element of adverse possession for the required 10-year period. *Nye v. Fire Group Partnership*, 265 Neb. 438, 657 N.W.2d 220 (2003). The term "continuous" means uninterrupted and stretching on without break or interruption. *Id.* The law of adverse possession does not require the possession to be evidenced by persons remaining continuously upon the land and constantly from day to day performing acts of ownership, and it is sufficient if the land is used continuously for the purposes to which it may be naturally adapted. *Id.* To meet the requirement of continuous possession, a plaintiff may tack the possession of predecessors in title. See, *Burk v. Demaray*, 264 Neb. 257, 646 N.W.2d 635 (2002) (to tack possession of predecessors in title for purpose of establishing adverse possession, predecessor occupant's possession must have been adverse to true owner); *Thornburg v. Haecker*, 243 Neb. 693, 502 N.W.2d 434 (1993) (occupant must show derivative title from predecessor in order to link occupant's possession with that taken under previous entry).

The district court determined that the Coxes have held title as joint tenants since January 2, 2009, a period of more than 10 years. It also determined that Elizabeth's period of individual ownership beginning in November 10, 1998, could be tacked to that of the Coxes' joint ownership as there was both privity of title and possession. And, the court concluded that the previous possession and identical use of the disputed parcel by Elizabeth's parents could be further tacked to extend the period of continuous possession back to April 14, 1970, for a total period of more than 49 years. Although the Coxes had not jointly owned the Cox property for 10 years at the time they filed their complaint, they claimed adverse possession of the disputed property through not only the period of their joint ownership of the Cox property and use of the disputed property but also through the periods of ownership and use by their predecessors in interest. The court did not err in tacking the periods of possession and use by Elizabeth and her parents to that of the Coxes for purposes of determining the Coxes' adverse possession claim.

The Rowes do not dispute the district court's findings on the element of continuous possession, but they rely on *Hardt v. Eskam*, 218 Neb. 81, 352 N.W.2d 583 (1984), to argue that the Coxes' possession of the disputed property was not continuous because their use of the property was seasonal and recreational. *Hardt* involved a claim of adverse possession to certain river land, which was suitable for hunting, fishing, and livestock pasture year round. The adverse possession claim was based on use of the property for intermittent cattle grazing and limited seasonal hunting. The Nebraska Supreme Court reversed the trial court's finding in favor of the plaintiff adverse possessors. In doing so, the Supreme Court stated that generally, seasonal and recreational use, and therefore, occasional use, even if occurring annually, cannot ripen into title for the real estate on which such recreation takes place. *Id.* The Supreme Court also stated that intermittent use by the adverse claimant, not inconsistent with and excluding the predominant and most suitable use of a disputed tract, cannot be the foundation for ownership by adverse possession. *Id.* The Supreme Court concluded that the plaintiffs' intermittent recreational use was not inconsistent with and did not exclude the predominant use as pasture for cattle and thus could not satisfy the element of continuous possession for the required 10-year period.

The Coxes argue that the present case is more similar to *Nye v. Fire Group Partnership*, 265 Neb. 438, 657 N.W.2d 220 (2003). In that case, the disputed property was suited for either residential or agricultural uses. The adverse claimant plaintiffs had planted and maintained grass during warm weather, stored and burned tree limbs, and erected a snow fence in the winter. The trial court had granted summary judgment in favor of the defendant title owners, but the Nebraska Supreme Court reversed, finding material issues of fact about whether the plaintiffs' use of the property met the elements of adverse possession. With respect to the element of continuous use, the Supreme Court determined that the plaintiffs' use was consistent with residential use year round. Unlike the intermittent use of the property in *Hardt* for a few weeks or months each year, the use in *Nye* "left the property in a continuous state of use for purposes of determining adverse possession." *Id.*, 265 Neb. at 444, 657 N.W.2d at 225. Accordingly, the Supreme Court concluded that there was an issue of fact whether the plaintiffs' use of the property was continuous.

We agree that the use of the disputed property in this case is more akin to that found in *Nye*. The disputed property is suitable for year round use as a residential backyard and that is how it has been used. Elizabeth's parents, then Elizabeth, and finally the Coxes during their period of joint occupancy have regularly used the disputed property as a part of their backyard in all seasons for a variety of family activities. Further, the Coxes placed a raised berm, a rock and stone border, and other permanent landscaping on the disputed property, which have been continuously present since 2005. The district court did not err in concluding that the Coxes' use of the disputed property has been continuous for more than the requisite 10-year period.

*Exclusive Possession.*

As observed by the district court, the element of exclusivity relates to whether the occupier shared possession or use of the property with the owner. Where both parties have used the property in dispute, there can be no exclusive possession on the part of one party. *Id.* Evidence of adverse possession must show the intention of the claimant to appropriate and use the property as his own to the exclusion of all others. *Id.*

The district court found no evidence that the Rowes or any prior owner of their residence made any material use of the disputed property for any purpose. The court found that, at most, the Rowes occasionally walked over the disputed property to gain access to the creek when clearing debris from the creek, but that they did not make any actual productive use of the disputed property, which was made "unnecessary and impractical" by the disputed property's location on the other side of the creek from the Rowe residence. The court found that the Rowes' first assertion of control over the disputed property did not occur until March 2018, which was when the Rowes took steps to mark the location on the disputed property where they intended to place a fence and when they sent letters to the Coxes asking them to remove their landscaping from the disputed property.

The Rowes argue that the Coxes' claim of exclusive use is defeated by Trevor's use of the property. According to Trevor, he "sometimes" stepped onto the disputed property when gathering firewood. He testified that "[s]ince [the Coxes] had the top all cleared, it was easier to access it from the top and work [his] way down rather than being in the creek water and trying to work [his] way up sometimes." Trevor testified that since the Rowes moved in in 2013, he has "clear[ed] debris from that creek" after heavy rains. He also clears brush from "that area" but acknowledged that he does not have to clear too much brush from "[t]he Coxes' side" as it is "already a little trimmed or trimmed down low." On cross examination, Trevor was asked whether he had "ever made any use of the top of the creek on the Cox side, other than standing there as [he] gathered things out of the creek." Trevor responded negatively, indicating that "[o]ther than being a convenient access point to get down the slope," he did not use it for other purposes. He also indicated that he went "over there to clean things out" frequently in the month after the Rowes moved in and then usually only after heavy rains and flooding. And, the record does not show any use of the property by Wei. She was asked on cross-examination whether she had ever "gone through the creek and up the other side of the bank and stood on the rear of [her] property that is in the Coxes' backyard," to which she responded, "I don't think so." This lack of or very limited use by the Rowes of the disputed property was confirmed by Elizabeth, who testified that other than seeing Trevor with the "fence and survey people" in March 2018, she never saw the Rowes on the disputed property or anyone on their behalf using the disputed property for any purpose.

We agree with the district court that the Rowes' first acts of meaningful control over the property occurred in March 2018 when they sent letters to the Coxes, demanding the removal of the berm and other landscaping so that the Rowes could install a fence. It is not at all clear from the record that Trevor's activities in clearing brush and debris occurred on the actual disputed property, and even if they had, his acts of occasionally walking across the disputed property to gain access to the creek when clearing flood debris or collecting firewood does not reflect an assertion of ownership and intention to use the property to the exclusion of all others. See *Nye v. Fire Group Partnership*, 265 Neb. 438, 657 N.W.2d 220 (2003). See, also, *Nennemann v. Rebuck*, 242 Neb. 604, 496 N.W.2d 467 (1993) (fact that trespassers may occasionally have hunted or fished on property without permission was not sufficient to interrupt adverse possession of disputed property by claimant who farmed property). The district court did not err in concluding that the Coxes' use of the disputed property has been exclusive for the requisite period.

*Notorious Possession.*

The acts of dominion over land allegedly adversely possessed must, to be effective against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in the adverse possession of another. *Siedlik v. Nissen*, 303 Neb. 784, 931 N.W.2d 439 (2019). The purpose of prescribing the manner in which an adverse holding will be manifested is to give notice to the real owner that his or her title or ownership is in danger so that he or she may, within the period of limitations, take action to protect his or her interest. *Id.* It is the nature of the hostile possession that constitutes the warning, not the intent of the claimant when he or she takes possession. *Id.*

Although the enclosure of land renders the possession of land open and notorious, it is not the only way by which possession may be rendered open and notorious. *Poullos v. Pine Crest Homes*, 293 Neb. 115, 876 N.W.2d 356 (2016). Nonenclosing improvements to land, such as erecting buildings or planting groves or trees, which show an intention to appropriate the land to some useful purpose, are sufficient. However, acts of routine yard maintenance, without more, are not sufficiently notorious to warn the titleholder that another is claiming or using the land for his own purpose. *Id.* Something more than a neighbor watering and mowing over the property line is needed to alert a reasonable owner that his title is in danger and he must take steps to protect his interest. *Id.*

In this case, the district court found the Coxes use of the disputed property sufficiently notorious. The court observed that significant landscaping improvements were installed, including raised berms and multiple plantings on and around those berms. The court also noted that a physical border, defining the claimed property was established visibly, not only by the grass edge, but also by an inlaid border of brick and stone installed in the ground along the creek. The court determined that the Coxes' regular use of the property for family activities was visible and apparent to any neighbor and sufficiently notorious that the Coxes' "claim to the title of their backyard would have been apparent to any reasonably prudent observer."

The Rowes argue that the Coxes' acts of possession are more akin to routine yard maintenance than to something more that was sufficiently notorious to warn the Rowes that the Coxes were claiming or using the disputed property for their own purposes. See *id.* They also argue that any significant improvement was not completed until 2013, and thus, not in place for the requisite period. We disagree with this assessment of the evidence. Clearly, the Coxes performed acts of routine yard maintenance, including mowing and watering grass within the disputed property area, but they also engaged in acts of dominion and control, reflecting their claim of ownership, of extending their backyard to the edge of the disputed property closest to the creek. And, these improvements were initiated well before 2013. Contrary to the Rowes' assertions in their brief, the record, through both Elizabeth's testimony and other documentary evidence, shows that the berms and inlaid border were first installed in 2005 in preparation for a christening party for the Coxes' first child. The district court properly credited that evidence, and we give weight to that fact. See *Adair Holdings v. Johnson*, 304 Neb. 720, 936 N.W.2d 517 (2020). The Rowes suggest that the inlaid border was not sufficient evidence of notorious possession given that it was not necessarily visible from a great distance or in certain photographs offered into evidence. There

is photographic evidence in the record, however, showing that the border was placed in a clear and discernable line, which would be obvious to any observer standing on or near the disputed property. This was confirmed by Elizabeth, who testified that if a person walked up in the Coxes' backyard, the border would be visible from various angles. Some of the photographs relied on at trial by the Rowes depicted other houses in the neighborhood and not the Cox residence. Other photographs relied on by the Rowes were satellite photographs in which the border was obscured by foliage or were taken from such a distance that a viewer would not necessarily expect to see the border.

Upon our de novo review, we find no error in district court's determination that the Coxes' possession of the disputed property was sufficiently notorious for more than the requisite period.

*Quieting Title.*

Upon our de novo review, we find that the Coxes proved the elements of adverse possession, including those not challenged by the Rowes. The district court did not err in finding that the Coxes established their claim for adverse possession and in quieting title to the disputed property in them. Accordingly, it did not err in denying the Rowes' motion to dismiss at the close of evidence or abuse its discretion in denying their motion for new trial.

CONCLUSION

The Coxes satisfied all necessary elements of their adverse possession claim, and the district court was correct in quieting title to the disputed property in the Coxes. Accordingly, the court did not err in denying the Rowes' motion to dismiss at the close of evidence or abuse its discretion in denying their motion for new trial.

AFFIRMED.